## Munday v. Underwriters Services Inc.

*Michael J. McElligott,* for plaintiffs.
*John W. Jordan IV,* for defendants.
*Brian S. Kane,* for additional defendant.

WETTICK, *J.,* August 30, 1995—Defendants and additional defendant contend that this action must be dismissed pursuant to 20 Pa.C.S. §3375 which reads in its entirety as follows:

"If a plaintiff or petitioner in any action or proceeding now pending or hereafter brought dies and a personal representative is not appointed within one year after a suggestion of such death is filed in the action or proceeding, any defendant or respondent may petition the court to abate the action as to the cause of action of the decedent. Copies of the petition shall be served upon the executor named in the will, if known to the defendant, and otherwise upon all known next of kin entitled to letters of administration. The court shall abate the action as to the cause of action of the decedent

if the delay in taking out letters is not reasonably explained."

Plaintiff Eugene Munday died on June 15, 1993. Counsel for defendants were notified of his death on August 5, 1993. Underwriters Services filed a notice of suggestion of death on October 14, 1993. Plaintiffs placed the case at issue on September 26, 1994. Defendants filed and served their petition for a rule to show cause why the action should not be abated on December 29, 1994. Lillian Munday was appointed as executrix of the estate of Eugene Munday on January 10, 1995. The petition for rule to show cause why action should not be abated for failure to take out letters was presented to me on January 20, 1995. On the basis of the allegations within the petition that a personal representative had not been appointed within one year after the filing of a suggestion of death, I issued the rule. My court order provided for an answer to be filed within 20 days, for all factual disputes to be resolved pursuant to Pa.R.C.P. nos. 206-209, for depositions to be completed within 40 days after the answer was filed, and for an argument before me on April 21, 1995 at 12 p.m.

Within 20 days, plaintiffs filed an answer and new matter in response to petition for rule to show cause why action should not be abated for failure to take out letters. Defendants filed a reply to the new matter. Defendants, however, elected not to take any depositions. Consequently, under Rule 209, the disputed factual allegations in the petition and answer are to be resolved in favor of plaintiffs.

Since section 3375 provides for the abatement of the action only where the delay is not reasonably explained, the first issue that I address is whether plaintiffs have offered a reasonable explanation for their failure

to take out letters within one year after the filing of the suggestion of death. The facts that I previously recited in the second paragraph of this opinion are not disputed. Additional facts set forth in plaintiffs' answer and new matter are that Eugene Munday's death was not related to injuries received from the automobile accident that is the basis of the breach of contract claim raised in this litigation, that all property owned by Mr. Munday was jointly held with his wife Lillian Munday, that there was no need to raise an estate on Mr. Munday's behalf for inheritance tax purposes because the parties' property was jointly held, and that defendants have not been prejudiced by plaintiffs' actions.

These facts do not constitute a reasonable explanation for the delay. I accept plaintiffs' statement that the parties' property was in joint name and that there was no need for inheritance tax purposes for a personal representative to be appointed. However, this lawsuit does not raise joint damage claims. Mr. Munday raises claims that are separate and independent from the claims of Ms. Munday. Mr. Munday's claims cannot be tried until a personal representative has been appointed. *Marzella v. King,* 256 Pa. Super. 179, 181, 389 A.2d 659, 660-61 (1978).

In their brief, plaintiffs state that they continually pursued their claims in a prompt and timely manner following Mr. Munday's death. They placed the case at issue and the parties are now waiting for the case to appear on a trial list. The case would not have moved more promptly if letters had been taken out. The parties, according to plaintiffs, were waiting for the court to list the case for trial and plaintiffs similarly were waiting before engaging the wheels of the probate and inheritance tax processes. Judicial efficiency and economy were served by plaintiffs' continually monitoring the

trial list in anticipation of final adjudication of this matter and by waiting to take out letters until the case was listed for trial. However, since defendants filed a suggestion of death, plaintiffs' explanation that they decided to wait to take out letters until the case had been scheduled for trial is not reasonable.

In their brief, plaintiffs say that they had disclosed their intention to defendants to "take steps toward probate when that end was in sight" and that defendants voiced no concern over this course of action. However, plaintiffs' answer and new matter does not contain such an allegation and plaintiffs did not submit any depositions that offer this explanation. Furthermore, the filing of a notice of suggestion of death shows that defendants intended to utilize section 3375 if plaintiffs did not take out letters.

While the delay has not been reasonably explained, plaintiffs correctly assert that defendants have not been prejudiced from plaintiffs' failure to take out letters within one year after defendants filed a suggestion of death.[1] Ms. Munday was appointed as executrix of the

---

1. The absence of prejudice is not the same as the absence of a reasonable explanation. See the case law governing amendments to pleadings (Pa.R.C.P. no. 1033) which holds that prejudice to the opposing party rather than the absence of a reasonable excuse for the delay is the controlling standard *(Horowitz v. Universal Underwriters Insurance Co.,* 397 Pa. Super. 473, 479-83, 580 A.2d 395, 398-400 (1990)); the case law governing the late joinder of additional defendants (Pa.R.C.P. no. 2253) which holds that the absence of prejudice is insufficient to obtain a late joinder and which requires the party seeking a late joinder to meet the requirement of a reasonable justification for the delay *(NPW Medical Center of N.E. Penna. Inc. v. LS Design Group, P.C.,* 353 Pa. Super. 341, 509 A.2d 1306 (1986)); and the case law governing the entry of a judgment of non pros which requires the party seeking the non pros to establish both the

estate within two weeks after defendants filed their petition requesting that the action be abated for failure to take out letters. The case is as ready to be tried as it would have been if letters had been taken out within the one-year period provided for in 20 Pa.C.S. §3375.

I now consider whether I must grant defendants' petition to abate the action where defendants have not experienced any prejudice from plaintiffs' failure to take out letters.[2] The controlling language of the legislation provides that a court "*shall* abate the action as to the cause of action of the decedent *if the delay in taking out letters is not reasonably explained.*" (emphasis added) While the word "shall" is ordinarily deemed mandatory, it may be read as only discretionary or permissive if this is most consistent with the legislative intent. *Grove North America v. Arrow Lift & Construction Equipment Co. Inc.,* 421 Pa. Super. 12, 18, 617 A.2d 369, 372 (1992). In this case, the legislature uses the term "may" in the first sentence of section 3375 for the purpose of giving the petitioner the option to file a petition to abate the action and it uses the term "shall" in the second sentence which governs service and is clearly mandatory. It is unlikely that it used the same term "shall" one sentence later in a different fashion. Furthermore, since the legislature established a standard for not abating the action (was the delay reasonably explained), it is unlikely that the legislature intended to give the court additional discretion unrelated to this standard.

---

absence of a compelling reason for the delay and prejudice *(James Brothers Lumber Co. v. Union Banking and Trust Co.,* 432 Pa. 129, 132, 247 A.2d 587, 589 (1968)).

2. The parties have advised me that there is no appellate case law addressing this issue.

I next consider the contention that I should deny the petition to abate the action because the personal representative was appointed before I ruled on the petition. This is simply a variation of the argument that plaintiffs did not sustain any prejudice; under the language of section 3375, the controlling issue is whether plaintiffs offer a reasonable explanation for the delay. If I accept the argument that the petition to abate the action should not be granted if letters are taken out promptly after the plaintiff receives notice of the filing of the petition, I would be reading an important notice requirement (Pa.R.C.P. no. 237.1) into the statute. There is nothing in the language of the legislation suggesting that the respondent is entitled to a second chance. A similar situation has been addressed in the case law governing the filing of a petition for a judgment of non pros for inactivity of record pursuant to *Penn Piping Inc. v. Insurance Company of North America,* 529 Pa. 350, 603 A.2d 1006 (1992). The case law holds that activity to move the case forward which the plaintiff takes after the filing of the petition cannot be used to defeat the petition. *Blackburn v. Sharlock, Repcheck, Engel and Mahler,* 433 Pa. Super. 581, 641 A.2d 612 (1994).

For these reasons, I enter the following order of court:

## ORDER

On August 30, 1995, it is hereby ordered that the petitions of Underwriters Services Inc., and The Pennsylvania Life and Health Insurance Guaranty Association requesting that the causes of action of Eugene Munday be abated is granted and these claims are dismissed.

# Commonwealth v. Monserrat

296

*Shelley Robins-New,* for the Commonwealth.
*Jack M. Myers,* for defendant.

LATRONE, *J.,* August 28, 1995—Damian Monserrat, this defendant, was tried at a bench trial before this court, and at the conclusion of that trial, he was found guilty of murder of the third degree and aggravated assault. These convictions were rooted in a criminal episode in which this defendant fatally battered Rosaline Roman, a three-month-old baby, while in the process of simultaneously assaulting Damarys Torres, his girlfriend. These crimes upon both victims occurred on the street outside of the defendant's residence at 2924 North Eighth Street here in Philadelphia on August 23, 1991, at approximately 8:30 p.m.

For his conviction of murder of the third degree, this defendant was sentenced to a term of imprisonment of not less than five years nor more than 10 years. In addition, a prison sentence of not less than two years nor more than four years was imposed for his conviction of the charge of aggravated assault. Both of these sentences were directed as concurrent sentences. Under the requirements of Pa.R.A.P. 906(a)(2), this court hereby acknowledges its receipt of a copy of a notice of appeal from these judgments of sentence.

Pursuant to Pa.R.Crim.P. 1123(a), Jack M. Myers, Esquire, trial counsel for this defendant, filed original and supplemental post-verdict motions. A perusal of the record discloses two assignments of error. These claims can be stated as follows: (1) there was insufficient

evidence to convict the defendant of murder of the third degree and aggravated assault; (2) the verdicts of murder of the third degree and aggravated assault were against the weight of the evidence.

In sum, a perusal of the post-verdict motions filed in this case discloses that the only advanced claims constituted a two-pronged challenge to both the sufficiency and weight of the record evidence to support this defendant's convictions. Hereinafter, all of these claims will be discussed and analyzed. Following these discussions and analyses, it will become quite obvious that this court correctly denied post-verdict motions and thereafter properly imposed the stated sentences in this case.

## I. SUFFICIENCY OF THE EVIDENCE CLAIMS

This defendant here challenges the sufficiency of the evidence found in this record to support his convictions of murder of the third degree and aggravated assault. Subsequent to the review of the record evidence which follows, it will become readily apparent that these assignments of error are lacking in merit.

The well-established standard to gauge the sufficiency of the evidence to support a criminal conviction is whether viewing the evidence in the light most favorable to the Commonwealth, the trier of fact could have reasonably determined that all of the elements of a crime have been established beyond a reasonable doubt. *Commonwealth v. Coccioletti*, 493 Pa. 103, 425 A.2d 387 (1981); *Commonwealth v. Keblitis*, 500 Pa. 321, 456 A.2d 149 (1983). Furthermore, the trier of fact, while passing upon the credibility of the witnesses and the weight to be afforded the evidence produced, is free to believe all, part, or none of the evidence. *Commonwealth v. Murray*, 460 Pa. 605, 334 A.2d 255 (1975).

When viewed in the perspective of this evidentiary standard, this record discloses the following facts: Damian Monserrat, this defendant, and Damarys Torres began living together for four years in Springfield, Massachusetts before moving to Philadelphia sometime in July of 1991. (N.T. 8/3/93 at p. 42; N.T. 8/2/93 at p. 33.) Damarys Torres had begotten a child, Rosaline Roman, by another man, while living with the defendant. (N.T. 8/3/93 at pp. 43, 79.) Damarys Torres and the defendant moved to Philadelphia about one month before this defendant viciously assaulted her and Rosaline Roman on August 23, 1991. (N.T. 8/2/93 at pp. 33, 69; N.T. 8/3/93 at p. 34.) The defendant, Damarys Torres, and the deceased all slept together in one bedroom at 2924 North Eighth Street. They also shared the remainder of the house with the defendant's family. This family included a stepmother, a father, a sister and a brother. (N.T. 8/2/93 at pp. 63, 69-70, 80.)

On August 23, 1991, at approximately 7:45 to 8 p.m., the defendant returned from work and informed Damarys Torres that his car had broken down. (N.T. 8/2/93 at p. 34.) Damarys Torres told the defendant to get the car and park it in front of the house. (N.T. 8/2/93 at p. 34.) The defendant left to retrieve the car; when he returned, he called over to Damarys Torres, who was then in the house, to come and to help him fix his car. (N.T. 8/2/93 at p. 34.) Damarys Torres noticed that the defendant was getting angry because he was unsuccessful in his attempts at repairing the car, so she returned to the house and sat on the front steps. (N.T. 8/2/93 at p. 34.) After a short while, Damarys Torres crossed the street to ask the defendant for a quarter. In response to that request, the defendant told her to "Get out of his face," and he raised his fist as if he was going to hit her. (N.T. 8/2/93 at pp. 35-36,

98.) Damarys Torres proceeded to return to her previous spot across the street on the front steps. At that time, Adelaida Irizarry, her neighbor, and Ricardo Morales, her husband, were standing closely nearby at the steps of the house next door. (N.T. 8/2/93 at pp. 36-37, 98-99.) At this point, Rosaline Roman began to cry, so Damarys Torres went inside to warm up some milk for her. (N.T. 8/2/93 at p. 37.) After a few minutes, Damarys Torres picked up Rosaline Roman from her crib in the living room and returned to the outside front steps where she began to feed her a bottle of milk. (N.T. 8/2/93 at pp. 37-38.) Shortly thereafter, the defendant locked up his car and started to walk across the street towards the house. (N.T. 8/2/93 at p. 38.) Damarys Torres, fearing that the defendant would hit her, descended the front steps and moved aside in order to get out of his way so that he could enter the house. (N.T. 8/2/93 at pp. 39, 100.) Damarys Torres had good reason to believe that the defendant would hit her since he had beaten her on a fairly regular basis in the past during their frequent arguments. (N.T. 8/3/93 at pp. 48-49.)

Several minutes after he entered the house, the defendant called out for Damarys Torres to come into the house, and she replied, "No." The defendant repeated these requests once or twice more, and each time, Damarys Torres refused to enter the house. (N.T. 8/2/93 at pp. 41-42, 70, 100-101, 106-107.) The defendant warned Damarys Torres that if she did not come into the house, he would hit her. (N.T. 8/2/93 at pp. 41-43, 101, 107.) Since he had apparently become angry at Damarys Torres' refusals to comply with his demands to enter the house, the defendant quickly exited the house and raced down the front steps to heatedly pursue her. As this defendant first attempted to grab Damarys Torres, she ran into the middle of Eighth Street and

quickly headed towards Birch Street with Rosaline Roman held in her arms. (N.T. 8/2/93 at pp. 45, 71, 101.) In quick pursuit, the defendant jumped over a car and started to chase her down Eighth Street. (N.T. 8/2/93 at pp. 45, 72, 88, 101.) When this defendant caught up to Damarys Torres near the corner of Eighth and Birch Streets, he began punching her in her head, face, and chest. At this onslaught, she was still cradling Rosaline Roman in her arms. (N.T. 8/2/93 at pp. 46-47, 72-73, 88, 102-103.) Damarys Torres attempted to protect herself and Rosaline Roman by bending over, but this defendant continued to hit Damarys Torres all over her head, face, and body. (N.T. 8/2/93 at pp. 46-47, 73, 101-112.) At one point during the attack, Damarys Torres warned, "Damian, the baby," but this defendant continued to throw punches. (N.T. 8/2/93 at p. 47.) This defendant zealously carried on his assault despite the fact that Rosaline Roman began to cry. (N.T. 8/2/93 at p. 48.) Damarys Torres tried to defend herself and Rosaline Roman during this malicious attack by throwing the baby's milk bottle at the defendant, but this tactic proved to no avail. (N.T. 8/2/93 at pp. 59-61, 89.)

After the defendant finished punching Damarys Torres and Rosaline Roman, he began pulling Damarys Torres back towards the house by her hair, despite her repeated pleas that he let her go. (N.T. 8/2/93 at pp. 48, 74-76.) At this time, Adelaida Irizarry called into the house to Aralie Monserrat, defendant's sister, and informed her that the defendant was hitting Damarys Torres. (N.T. 8/2/93 at p. 103.) Aralie Monserrat exited the house with a broomstick, and along with her brother Enrique Monserrat, she attempted to break up the attack. (N.T. 8/2/93 at pp. 48-49, 76.) The defendant let go of Damarys Torres only after Enrique Monserrat told

him to stop hitting her. (N.T. 8/2/93 at pp. 49, 76.) After Damarys Torres was finally released by this defendant, Adelaida Irizarry came and took Rosaline Roman from her. Thereafter, she carried the baby to her house which was located closely nearby. (N.T. 8/2/93 at pp. 49-50, 103.)

The defendant then returned to the house with Enrique and Aralie Monserrat, his brother and sister. (N.T. 8/2/93 at p. 77.) An argument between the three siblings ensued. During this argument, Aralie Monserrat hit the defendant in his back with her broomstick. (N.T. 8/2/93 at p. 77.) Damarys Torres returned to the house and informed the defendant that he had also hit Rosaline Roman during the course of his attack upon her. (N.T. 8/2/93 at p. 77.) The defendant denied hitting Rosaline Roman. This defendant immediately left the premises, and he was not thereafter seen again by any of the witnesses to his violent attacks upon his victims. (N.T. 8/2/93 at pp. 68, 77-78, 105.)

During the time that this defendant was arguing with Enrique Monserrat, Aralie Monserrat, and Damarys Torres at his house, Adelaida Irizarry had returned to her own home with Rosaline Roman. At that time, she noticed that the baby had a lump on her forehead and that her "eyes were rolling all over." (N.T. 8/2/93 at pp. 103-105.) Adelaida Irizarry also discovered a couple of lumps on the back of Rosaline Roman's head. (N.T. 8/2/93 at p. 104.) All three of the Commonwealth's witnesses, Enrique Monserrat, Damarys Torres, and Adelaida Irizarry, testified that Rosaline Roman was in good physical condition immediately prior to this defendant's attack upon her. (N.T. 8/2/93 at pp. 51, 79, 98-99, 105.)

Adelaida Irizarry told Aralie Monserrat to call Damarys Torres. (N.T. 8/2/93 at p. 104.) When Damarys

Torres arrived at her home, Adelaida Irizarry was putting some butter and salt on Rosaline Roman's head in an attempt to get the swelling down. (N.T. 8/2/93 at pp. 50-51.) Since they were alarmed by Rosaline Roman's physical condition, Damarys Torres and Adelaida Irizarry took the baby to St. Christopher's Hospital where she was immediately admitted for emergency treatment. (N.T. 8/2/93 at pp. 50-51, 104-105.) When Rosaline Roman arrived at the hospital, she was in critical condition. (N.T. 8/2/93 at p. 79.) Three days later, on August 26, 1991, at 1:30 p.m., Rosaline Roman was pronounced dead at St. Christopher's Hospital. (N.T. 8/2/93 at p. 53; N.T. 8/3/93 at p. 6; Exhibit C-3.) In addition, Damarys Torres had herself sustained lumps on the back of her head as a result of this defendant's brutal attack, but she did not seek medical treatment for such injuries while she was at St. Christopher's Hospital. (N.T. 8/2/93 at pp. 64-66; N.T. 8/3/93 at pp. 43-44.)

Dr. Adrienne Sekula-Perlman, M.D., an Associate Medical Examiner for the City of Philadelphia, was the forensic physician who performed a postmortem examination on the deceased. The examination disclosed a great number of injuries to the deceased's head, both internally and externally. (N.T. 8/3/93 at p. 7; Exhibit C-3.) As to the external injuries, such injuries were blunt force injuries consisting of lacerations and contusions to the forehead, left and right side of the head, and the back of the head, each with underlying internal fractures. (N.T. 8/3/93 at pp. 7-8; Exhibit C-3.) Dr. Sekula-Perlman testified that Rosaline Roman had four fractures to her skull which she referred to at various times as "large," "very, very large," and "large gaping fractures." (N.T. 8/3/93 at pp. 7-9, 11-12; Exhibit C-3.) In addition to these four injuries, Rosaline Roman had

a bruise to the top of her head and bruises across the cheek, nose bridge, and eyebrow that were consistent with knuckle prints. (N.T. 8/3/93 at pp. 8-9; Exhibit C-3.)

As far as the internal examination, Dr. Sekula-Perlman stated that due to the trauma to her head, Rosaline Roman's brain matter swelled up and squeezed through the four internal fractures inside her skull. (N.T. 8/3/93 at pp. 9-10; Exhibit C-3.) In addition to the aforementioned swelling, there was extensive hemorrhaging of Rosaline Roman's brain, and the brain tissue itself was macerated. (N.T. 8/3/93 at pp. 10, 12; Exhibit C-3.) Dr. Sekula-Perlman went on to note that "we rarely see skull fractures in babies" because "it takes a lot of force to break a baby's skull" due to the fact that a baby's skull is very soft and bendable. (N.T. 8/3/93 at p. 11; Exhibit C-3.) After examining the injuries to Rosaline Roman's head, Dr. Sekula-Perlman concluded that she was struck "at least six times" by another person or persons. (N.T. 8/3/93 at pp. 11-12; Exhibit C-3.) Dr. Sekula-Perlman opined that the cause of death was multiple blunt force injuries sustained by the deceased and that the manner of death was homicide. (N.T. 8/3/93 at p. 12; Exhibit C-3.)

A. *Aggravated Assault*

The defendant contends that the evidence was insufficient to sustain his conviction of aggravated assault. The Crimes Code defines aggravated assault as follows:

"Section 2702. Aggravated assault

"(a) Offense defined.—A person is guilty of aggravated assault if he:

"(1) attempts to cause serious bodily injury to another or causes such injury intentionally, knowingly, or reck-

lessly under circumstances manifesting extreme indifference to the value of human life. . . ." 18 Pa. C.S. §2702(a)(1).

The defendant argues that this court erred in returning a guilty verdict of aggravated assault concerning Damarys Torres because she did not receive any serious bodily injuries or seek any medical treatment. Under the Crimes Code, serious bodily injury includes bodily injury which creates a substantial risk of death or which causes serious, permanent disfigurement, or a protracted loss or impairment of the function of any bodily member or organ. 18 Pa.C.S. §2301. This argument is misplaced, however, because the crime of aggravated assault can be established upon the presentation of sufficient evidence of the intent to inflict serious bodily injury without further proof that a victim actually suffered such injuries. *Commonwealth v. Sirianni,* 286 Pa. Super. 176, 428 A.2d 629 (1981) (evidence that defendant fired two shots at point-blank range resulting in only laceration to the arm sufficient to establish aggravated assault); *Commonwealth v. Chance,* 312 Pa. Super. 435, 458 A.2d 1371 (1983) (evidence that the defendant had clicked an unloaded gun as it was pointed at his victim was sufficient to sustain an aggravated assault conviction); *Commonwealth v. Anthony,* 376 Pa. Super. 623, 546 A.2d 1122 (1988) (proof of requisite intent without actual serious bodily injuries sufficient to support a conviction); *Commonwealth v. Russell,* 313 Pa. Super. 534, 460 A.2d 316 (1983) (same). Further, an intent to cause serious bodily injury can be shown by the circumstances surrounding the incident. *Commonwealth v. Elrod,* 392 Pa. Super. 274, 572 A.2d 1229 (1990), *appeal denied,* 527 Pa. 629, 592 A.2d 1297 (1990).

In order for a defendant to be convicted of aggravated assault and battery, proof of malice is required. *Com-*

*monwealth v. Szulczewski,* 233 Pa. Super. 389, 335 A.2d 810 (1975); *Commonwealth v. Hickson,* 402 Pa. Super. 53, 586 A.2d 393 (1990), *appeal denied,* 527 Pa. 663, 593 A.2d 838 (1991). Indeed, the malice which is sufficient to support convictions for both the crimes of aggravated assault or third-degree murder is definitively the same at the common law and consists of wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, and a mind regardless of social duty, though a particular person may not be intended to be injured. *Commonwealth v. Fierst,* 423 Pa. Super. 232, 620 A.2d 1196 (1993). The identical states of mind of malice required for both of these crimes will also become of great significance in our forthcoming discussion and analysis of the doctrine of transferred intent and third-degree murder at Part I(B) of this opinion *infra.*

Here, the defendant first threatened Damarys Torres by raising his fist, as if to punch her, when she walked across Eighth Street to ask him for a quarter, as he was attempting to repair his car. After the defendant was unsuccessful in his attempts at repairing his car, he became angry and demanded that Damarys Torres come into the house at 2924 North Eighth Street. After Damarys Torres rejected the defendant's repeated requests to come into the house, he stated that if she did not come into the house, he would hit her. When Damarys Torres still refused to go into the house, the defendant came down the front steps of the house and tried to grab her, as she was still holding Rosaline Roman, her three-month-old baby. Damarys Torres ran into the street with the baby in an attempt to escape from the defendant. The defendant jumped over a car and chased Damarys Torres down the street. When the defendant caught Damarys Torres near the corner of

Eighth and Birch Streets, he grabbed her by the hair and began punching her all over her face, head, and body, despite the fact that she was still holding Rosaline Roman in her arms and cradled against her chest. The defendant continued his assault even after Damarys Torres alarmingly stated, "Damian, the baby." Damarys Torres tried to protect herself and Rosaline Roman by bending over to avoid the impact of the defendant's punches. Damarys Torres also threw the bottle that she was using to feed Rosaline Roman at the defendant. However, these attempts at self-defense by Damarys Torres were unsuccessful. The defendant only stopped his assault when his brother and sister, who was carrying a broomstick, came out of the house.

Although Damarys Torres did not seek medical treatment for her head injuries while she was at St. Christopher's Hospital, the defendant's intent to cause serious bodily injury was further corroborated by the severity of the additional injuries to Rosaline Roman. Dr. Sekula-Perlman testified that Rosaline Roman was struck in the head at least six times by another person or persons. These blows produced four large and gaping fractures to her skull. Rosaline Roman ultimately died three days later as a result of this defendant's repeated blows to her head.

Dr. Sekula-Perlman made a point of noting that it takes a lot of force to break a baby's skull because of the fact that "babies' skulls are very soft, so they will bend and overlap and they will not break." (N.T. 8/3/93 at p. 11; Exhibit C-3.) In order to explain how much force was needed to fracture Rosaline Roman's skull, Dr. Sekula-Perlman likened a baby's skull to a plastic milk bottle in terms of its elasticity. (N.T. 8/3/93 at p. 11; Exhibit C-3.) Dr. Sekula-Perlman concluded her analogy by saying, "When you punch a plastic

milk bottle, it gives, but if you punch it hard enough and enough times, it will break eventually." (N.T. 8/3/93 at p. 11; Exhibit C-3.) This uncontradicted evidence of the force required to fracture Rosaline Roman's skull conclusively shows that the defendant intended to inflict serious bodily injury upon Damarys Torres. If Damarys Torres had not been holding Rosaline Roman in front of her chest as a shield, some or all of the defendant's lethal blows would have struck her, thereby directly causing her serious physical injury, if not death. Unquestionably, this defendant's acts directed against Damarys Torres established that he then harbored a malicious state of mind specifically towards her. Initially, he shouted commands that she enter the house. After she rejected his several requests to enter, he threatened that he would come out of the house and hit her. Finally, he did exit the house and zealously and angrily jumped over a car in an attempt to catch her. She was fearfully running down the center of the street in order to avoid a beating which she definitely knew to be forthcoming. When this defendant finally caught her, he immediately started to punch her over all parts of her body. Even when Damarys Torres cautioned him to stop punching at her since he might be striking her child, this defendant did not stop his pugilistic onslaught. Lastly, after intervention by family members caused a termination of his punching, this defendant sought to escort an unwilling Damarys Torres back to the house by pulling her by the hair. Such conduct manifested the cruelty, hardness of heart, and wickedness of disposition encompassed within the legal definition of malice. The efficacy of this conclusion is not weakened by the mere happenstance that the intended victim ultimately sustained only several lumping injuries to the back of her head as the direct result of such malicious conduct.

In sum, there was amply sufficient evidence in this record to support this defendant's conviction of the crime of aggravated assault. Accordingly, this sufficiency claim must be rejected.

## B. *Murder of the Third Degree*

The defendant next claims that the record evidence was insufficient to sustain his conviction of murder of the third degree. The defendant puts forth four basic arguments in support of this contention: (1) there was no evidence of aggravated assault upon Damarys Torres, therefore, even under a "transferred intent" theory, the injuries sustained by Rosaline Roman cannot be third-degree murder; (2) there was no intent to injure or harm Rosaline Roman; (3) the Commonwealth failed to prove beyond a reasonable doubt that "malice" existed and that guilt was not proven beyond a reasonable doubt as to third-degree murder; (4) there was no weapon or instrument used by the defendant.

The defendant's first argument is erroneously based upon his contention that there was no evidence of an aggravated assault committed upon Damarys Torres. As was discussed in Part I(A) *supra* of this opinion, and as this trial court concluded, there was more than adequate proof in this record to establish the malicious state of mind required to support this defendant's conviction of aggravated assault upon Damarys Torres. Thus, the defendant's first argument must be rejected.

The defendant's second argument relates closely to his previous one, in that they both address the element of intent, or lack thereof. Even if the defendant's contention that there was no intent to harm Rosaline Roman is accepted as true, it does not mean that he cannot be found guilty of third-degree murder. Third-degree murder does not require specific intent to kill; an in-

tentional act which indicates recklessness of consequences and mind regardless of social duty is sufficient, even if there was no intent to harm another. *Commonwealth v. Seibert,* 424 Pa. Super. 242, 622 A.2d 361 (1993). In the case at bar, the defendant's intentional acts of assaulting Damarys Torres while she was holding her three-month-old baby were sufficient to uphold a finding of third-degree murder.

As was previously discussed in Part I(A) *supra* of this opinion dealing with aggravated assault, the defendant was found to have the requisite malicious intent to cause serious bodily injury to Damarys Torres. Moreover, the identical constituent element of malice required to support a conviction of the charge of aggravated assault will likewise support a conviction of murder of the third degree. *Commonwealth v. Fierst, supra.* Indeed, the classical definition of murder of the third degree found in hornbook law is that it is restricted to the intent to wound, maim, or do serious bodily injury and not to kill, as is the case with murder of the first degree. The doctrine of transferred intent provides that if the intent to commit a crime exists, that intent can be transferred for the purpose of finding the intent element of another crime. See *Commonwealth v. Jones,* 530 Pa. 591, 610 A.2d 931 (1992) (under doctrine of transferred intent, criminal responsibility is not affected by the fact that bullets struck persons other than one for whom they were apparently intended); *Commonwealth ex rel. McCant v. Rundle,* 418 Pa. 394, 211 A.2d 460 (1965) (intent to commit murder of one individual "transferred" where the actual victim was not the intended victim); *Commonwealth v. Lyons,* 283 Pa. 327, 129 A. 327 (1925) (same); *Commonwealth v. Eisenhower,* 181 Pa. 470, 37 A. 521 (1897) (same); *Commonwealth v. Brevessee,* 160 Pa. 451, 28 A. 824 (1894) (same).

This doctrine of transferred intent was fully and clearly explained by two eminent text writers in the following fashion:

*"(d) Intentional Crimes-Unintended Victim ('Transferred intent'.)* In the unintended-victim (or bad-aim) situation—where A aims at B but misses, hitting C—it is the view of the criminal law that A is just as guilty as if his aim had been accurate. Thus where A aims at B with a murderous intent to kill, but because of a bad aim he hits and kills C, A is uniformly held guilty of the murder of C. And if A aims at B with a first-degree-murder state of mind, he commits first-degree murder as to C, by the majority view. So too, where A aims at B with intent to injure B but, missing B, hits and injures C, A is guilty of battery of C. On similar principles, where A throws a rock at B's property intending to injure or destroy it but instead hits and injures or destroys C's property, A should be guilty of malicious mischief to C's property. And if A sets a fire with intent to burn B's property, but because of a shift in the wind the fire burns C's property, A should be guilty of the arson of C's property.

"These proper conclusions of law as to criminal liability in the bad-aim situation are sometimes said to rest upon the ground of 'transferred intent': To be guilty of a crime involving a harmful result to C, A must intend to do harm to C; but A's intent to harm B will be transferred to C; thus A actually did intend to harm C; so he is guilty of the crime against C. This sort of reasoning is, of course, pure fiction. A never really intended to harm C; but it is not necessary, in order to impose criminal liability upon A, to pretend that he did. What is really meant, by this roundabout method of explanation, is that when one person (A) acts (or omits to act) with intent to harm another person (B),

but because of a bad aim he instead harms a third person (C) whom he did not intend to harm, the law considers him (as it ought) just as guilty as if he had actually harmed the intended victim. In other words, criminal homicide, battery, arson and malicious mischief do not require that the defendant cause harm to the intended victim; an unintended victim will do just as well." (footnotes omitted) *Substantive Criminal Law,* LaFave and Scott, §312(d), pp. 399-400 (1986).

Moreover, the doctrine of transferred intent has been incorporated into section 303(b) of the Crimes Code, 18 Pa. C.S. §303(b), as follows:

"(b) Divergence between result designed or contemplated and actual result.—When intentionally or knowingly causing a particular result is an element of an offense, the element is not established if the actual result is not within the intent or the contemplation of the actor unless:

"(1) the actual result differs from that designed or contemplated as the case may be, only in the respect that a different person or a different property is injured or affected or that the injury or harm designed or contemplated would have been more serious or more extensive than that caused; or

"(2) the actual result involves the same kind of injury or harm as that designed or contemplated and is not too remote or accidental in its occurrence to have a bearing on the actor's liability or on the gravity of his offense."

These provisions of the Crime Codes pertaining to the doctrine of transferred intent are derived from section 2.03 of the Model Penal Code. To obtain a full and better understanding of both the proposed and actual legislation, a reading of the comments of the drafters of the proposed provisions might be helpful:

"[§303(b)] . . . [Subsection (b)] is addressed to the case where the culpability requirement with respect to the result is . . . [intent] or knowledge, i.e., where . . . [intentionally] or knowingly causing a specified result is a material element of the offense. Here if the actual result is not within the . . . [intent] or the contemplation of the actor, the culpability requirement is not established, except in the circumstances set forth in . . . [paragraphs (1) and (2)].

"[Paragraph (1)] deals with the situation where the actual result differed from the result designed or contemplated only in the respect that a different person or different property was injured or affected or that the injury or harm designed or contemplated was more serious or more extensive than that caused. Such variations between . . . [intent] or contemplation and result are made immaterial, as almost certainly would be the view under existing law.

"[Paragraph (2)] deals with the situation where the actual result involved the same kind of injury or harm as that designed or contemplated but the precise injury inflicted was different or occurred in a different way. Here the draft makes no attempt to catalogue the possibilities, *e.g.,* to deal with the intervening or concurrent causes, natural or human; unexpected physical conditions; distinctions between the infliction of mortal or non-mortal wounds. It deals only with the ultimate criterion by which the significance of such possibilities ought to be judged. . . . [T]he question to be faced is whether the actual result is 'too . . . accidental in its occurrence to have a . . . bearing on the actor's liability or on the gravity of his offense.' " Model Penal Code Comment: (T.D. No. 4, p. 132).

Under the well-established doctrine of transferred intent, the defendant's intent to cause serious bodily injury

to Damarys Torres can be transferred for the purpose of finding the intent element of third-degree murder. Therefore, the defendant's argument that he is not guilty of third-degree murder because he lacked the intent to harm the deceased, even if accepted as true, is irrelevant under the doctrine of transferred intent because of the fact that his intent to cause serious bodily injury to Damarys Torres was transferred to Rosaline Roman.

Here, as a fact, this defendant did not intend or contemplate that his blows would fatally injure this deceased child as "the actual result." Thus, culpability would not normally be imposed upon him except if the circumstances set forth in the subsections (1) and (2) of section 303(b) of the Crimes Code have been established. First, the requirements of subsection (1) were met since this defendant injured Rosaline Roman in lieu of Damarys Torres. Therefore, the actual result differed from the contemplated result only in that a different person was injured and affected. Second, the requirements of subsection (2) were likewise fulfilled. In this case, this defendant intended or contemplated the infliction of serious bodily injuries upon the person of Damarys Torres. The actual result in this horrible scenario was that the same kind of serious injury or harm was also inflicted upon Rosaline Roman. At all times, this defendant's mind was designed to inflict serious bodily injury upon another person. Unfortunately, the precise injury in this case, which was actually inflicted, was "different or occurred in a different way" since it proved fatal to Rosaline Roman. Was the actual result in this case "too accidental in its occurrence to have a . . . bearing on the actor's liability or on the gravity of his offense?" The obvious answer to this question is no. The reasons for this negative answer, under the facts and circumstances established by the

evidence to be found in this record, are that this defendant intentionally and maliciously perpetrated the crime of aggravated assault upon Damarys Torres and that he simultaneously, maliciously, and unlawfully killed Rosaline Roman in a fashion which amounted to third-degree murder.

The defendant's last two claims both address the existence of malice which is required for third-degree murder. The defendant asserts in his final two arguments that the element of malice necessary for a finding of murder of the third degree was not established by the Commonwealth and that the court erred in returning a verdict of third-degree murder because there was no weapon used by the defendant. Under the Crimes Code, murder of the third degree includes all kinds of murder which are not first or second degree. 18 Pa.C.S. §2502(c). Both under the Crimes Code and at common law, the distinguishing feature of murder of the third degree is the element of malice. *Commonwealth v. Young,* 494 Pa. 224, 431 A.2d 230 (1981); *Commonwealth v. Pitts,* 486 Pa. 212, 404 A.2d 1305 (1979); *Commonwealth v. Carter,* 481 Pa. 495, 393 A.2d 13 (1978); *Commonwealth v. Austin,* 394 Pa. Super. 146, 575 A.2d 141 (1990); *Commonwealth v. Wanamaker,* 298 Pa. Super. 283, 444 A.2d 1176 (1982).

The element of malice required for third-degree murder as generally defined "exists not only where there is a particular ill will, but also whenever there is a wickedness of disposition, hardness of heart, wanton conduct, cruelty, recklessness of consequences and a mind regardless of social duty." *Commonwealth v. Commander,* 436 Pa. 532, 537, 260 A.2d 773, 776 (1970) (quoting *Commonwealth v. Gooslin,* 410 Pa. 285, 189 A.2d 157 (1963)). In cases where fists, rather than a weapon, are utilized to commit a killing, malice may

not be presumed; however, malice may be inferred under certain circumstances. *Commonwealth v. Smouse,* 406 Pa. Super. 369, 594 A.2d 666 (1991); *Commonwealth v. Petrino,* 332 Pa. Super. 13, 480 A.2d 1160 (1984). Among the circumstances that should be considered when determining the existence of malice in a case where fists are used to cause a death are the size of the assailant, the ferocity of the attack, its duration, the provocation for it, and the manner in which the fists were used. *Smouse, supra;* see *Commonwealth v. Buzard,* 365 Pa. 511, 76 A.2d 394 (1950); *Commonwealth v. Dorazio,* 365 Pa. 291, 74 A.2d 125 (1950). Moreover, for the limited purposes relevant to the facts of this case, the Crimes Code defines a deadly weapon as "any other device or instrumentality which in the manner in which it is used or intended to be used, is calculated or likely to produce death or serious bodily injury." 18 Pa.C.S. §2301. Under the facts established by the record evidence in this case, this defendant did use his fists in a manner that was calculated to produce serious bodily injury upon his two victims. Consequently, this physiological device or instrumentality constituted a deadly weapon in this case. Indeed, the human fist has been specifically found to constitute a deadly weapon under similar circumstances. See *Commonwealth v. Dorazio, supra.*

Here, the "particular circumstances" of this record clearly reveal that this defendant exhibited the ill-will, wickedness of disposition, and wanton conduct required to establish murder of the third degree. The defendant, who stands 5' 7" and weighs 150-160 pounds, is almost four feet taller and over 150 pounds heavier than the deceased, who weighed eight pounds and was 21 inches long. (N.T. 8/3/93 at p. 6; Exhibit C-3.) The eyewitness testimony presented established that the defendant con-

tinuously assaulted Damarys Torres, who was holding the deceased in her arms, for two minutes. (N.T. 8/2/93 at p. 103.) The defendant even struck the deceased after Damarys Torres urged him to stop and tried defending herself and Rosaline Roman by throwing a milk bottle at him.

The Commonwealth's medical testimony established that the deceased suffered extensive injuries to her head, including four large fractures of the skull and internal hemorrhaging and swelling of the brain as the result of at least six blows inflicted by this defendant. In addition, the postmortem examination in this case disclosed that the deceased's death was caused by multiple blunt force injuries to her head. Instantly, in light of the numerous injuries suffered by Rosaline Roman, it is clear that the defendant's attack upon her was both ferocious and unrelenting. In addition to the well-established inference of malice which arises from a slayer's use of a deadly weapon upon a vital part of his or her victim's body, the presence of malice required for a third-degree murder can itself be inferred from the nature and severity of the wounds sustained and the number of blows inflicted, especially in instances where an adult had repeatedly used excessive force upon a child of tender years. *Commonwealth v. Bowden,* 442 Pa. 365, 276 A.2d 350 (1970); *Commonwealth v. Paquette,* 451 Pa. 250, 301 A.2d 837 (1973); *Commonwealth v. Watson,* 269 Pa. Super. 285, 409 A.2d 891 (1979). Here, both the results of the postmortem examination and the testimony of eyewitnesses served to clearly establish the nature and severity of the wounds sustained by this deceased child victim. Likewise, the same evidence also vividly proved the number of blows inflicted upon her by this defendant. Finally, the proven number of blows inflicted upon and the resulting nature

and severity of the injuries sustained by this child victim were more than adequately sufficient to establish the malice required for a third-degree murder conviction.

Furthermore, the testimony and statements of three Commonwealth witnesses, Adelaida Irizarry, Damarys Torres, and Enrique Monserrat, established that the defendant was arguing with Damarys Torres immediately prior to assaulting her and the deceased; obviously, Rosaline Roman's conduct on the evening of the assault did not act as the catalyst for this fatal attack. In sum, the record evidence of this prolonged and unprovoked attack upon a helpless infant victim clearly established the element of malice required for murder of the third degree beyond a reasonable doubt. Consequently, defendant's claims of error in this regard must be rejected.

Moreover, after this defendant had compulsively concluded his fisticuff assaults upon his two victims on the street, he returned to his home. After a brief dispute in which he denied injuring the deceased child, he quickly left the residence without making any attempts to obtain aid or assistance for her. A defendant's failure to obtain aid or assistance for his victim after injuring him/her supports an inference that he has acted with malice. *Commonwealth v. Boyd,* 461 Pa. 17, 334 A.2d 610 (1975); *Commonwealth v. Lawrence,* 428 Pa. 188, 232 A.2d 768 (1968). Further, once this defendant left his home on August 23, 1991, he engaged in conduct of flight and concealment until March 5, 1993. On that date, he was arrested in Miami, Florida by agents of the Federal Bureau of Investigation. After this absence for over one and one-half years, he was extradited back to Philadelphia, Pennsylvania to be tried here. (N.T. 8/3/93 at pp. 14-15, 21-23, 24-29.) Such evidence that this defendant fled from the crime scene supported an inference of his consciousness of guilt. *Commonwealth*

*v. Jones,* 530 Pa. 591, 610 A.2d 931 (1992). In sum, these circumstantial proofs regarding failure to aid and assist a victim and to take flight and concealment further corroborated the other direct evidence which supported this defendant's conviction.

Accordingly, the evidence presented was clearly sufficient to support this defendant's conviction of murder of the third degree.

## II. WEIGHT OF THE EVIDENCE CLAIM

Additionally, this defendant has requested a new trial on the ground that his verdicts of guilt were against the weight of the evidence. Despite the fact that there is case law holding that a weight of the evidence claim does not constitute an appealable issue, this court will address this issue in the interest of thorough discussion and analysis. See *Commonwealth v. Wallace,* 522 Pa. 297, 561 A.2d 719 (1989); *Commonwealth v. Nelson,* 514 Pa. 262, 271 n.3, 523 A.2d 728, 733 n.3 (1987); *contra, Commonwealth v. Murray,* 408 Pa. Super. 435, 597 A.2d 111 (1991).

A new trial on that ground will be granted only where it appears from the record that the verdict or verdicts were so contrary to the evidence as to shock one's sense of justice and to make the award of a new trial imperative, so that right may be given another opportunity to prevail. *Commonwealth v. Laing,* 310 Pa. Super. 105, 456 A.2d 204 (1983); *Commonwealth v. Barnhart,* 290 Pa. Super. 182, 434 A.2d 191 (1981). A new trial based on the theory that a verdict is contrary to the weight of the evidence will be granted where the evidence is so tenuous, vague, and uncertain that it shocks an appellate court's conscience. *Commonwealth v. Edwards,* 399 Pa. Super. 545, 582 A.2d 1078 (1990). A determination respecting the weight of the evidence

allows a trial court to make an independent assessment of the credibility of the prosecution's case. *Commonwealth v. Pronkoskie,* 498 Pa. 245, 445 A.2d 1203 (1982); *Commonwealth v. Zapata,* 447 Pa. 322, 290 A.2d 114 (1972). Contrariwise, a sufficiency determination requires a trial court to accept the evidence produced by the prosecution in its most favorable light. *Commonwealth v. Smith,* 490 Pa. 329, 416 A.2d 494 (1980); *Commonwealth v. Joyner,* 489 Pa. 502, 414 A.2d 1003 (1980). An adverse ruling to the prosecution on the issue of weight of the evidence is remedied by the award of a new trial. *Commonwealth v. Davis,* 477 Pa. 197, 383 A.2d 891 (1978); *Commonwealth v. Meadows,* 471 Pa. 201, 369 A.2d 1266 (1977). In contrast, an insufficiency of the evidence determination adverse to the prosecution requires the remedy of discharging the defendant for the crime or crimes with which he is charged. *Commonwealth v. Vogel,* 501 Pa. 314, 461 A.2d 604 (1983); *Commonwealth v. Eberle,* 474 Pa. 548, 379 A.2d 90 (1977). Finally, the question of whether or not to grant a new trial on the ground that the verdict was against the weight of the evidence is within the sound discretion of the trial court whose decision will not be disturbed absent an abuse of discretion. *Commonwealth v. Pronkoskie, supra; Commonwealth v. Fromal,* 392 Pa. Super. 100, 572 A.2d 711 (1990).

In this case, the testimony of the Commonwealth's key witnesses, Damarys Torres, Enrique Monserrat, and Adelaida Irizarry, specifically described the details of the crimes of murder of the third degree and aggravated assault. Such evidence was credible and entitled to full weight.

In addition, this defendant presented five witnesses who testified to his good reputation in the community

as a peaceful and law-abiding citizen. (N.T. 8/3/93 at pp. 36-38, 42, 50-54.) Although this discussion of good reputation evidence is more appropriate in the context of a sufficiency challenge, it is discussed here in the best interest of comprehensive coverage. The defendant's presentation of five reputation witnesses in this case cannot be afforded much weight. Three of the five witnesses for the defendant were family members. A fourth, Tomasa Rivera, testified that he only knew the defendant for a month and a half, and when asked about the defendant's reputation to being a peaceful, law-abiding citizen, responded, "I can only tell you what I think or feel, that he's a good person." (N.T. 8/3/93 at p. 53.) This response is not testimony concerning the defendant's reputation for peacefulness; rather, it is a personal opinion as to the character of the defendant, and as such should be given no weight. The fifth witness to testify regarding the defendant's reputation for peacefulness was Damarys Torres, the victim of the defendant's aggravated assault and the same person who admitted later during cross-examination that the defendant struck her in the past on a fairly regular basis during their arguments.

Of course, good reputation evidence, in and of itself, may create a reasonable doubt of guilt and require a verdict of not guilty. *Commonwealth v. Neely,* 522 Pa. 236, 561 A.2d 1 (1989); *Commonwealth v. Shapiro,* 223 Pa. Super. 15, 297 A.2d 161 (1972); *Commonwealth v. Nellom,* 388 Pa. Super. 314, 565 A.2d 770 (1989). On the other hand, after giving a defendant the benefit of fair and full consideration of the evidence of good reputation in connection with all of the evidence in a case, a factfinder can return a verdict of guilt if convinced that the Commonwealth has introduced outweighing evidence which has proven the defendant's

guilt beyond a reasonable doubt. *Commonwealth v. Stoner,* 265 Pa. 139, 108 A.2d 624 (1919); *Commonwealth v. Holland,* 480 Pa. 202, 389 A.2d 1026 (1978). In its factfinding functions, after giving the defendant's evidence of good reputation a full and fair evaluation, this court determined that the Commonwealth's evidence was entitled to full and countervailing weight and that it established his guilt beyond a reasonable doubt of both of the crimes for which convictions were returned in this case.

The court had opportunities to observe the demeanors and deportments of all of the Commonwealth witnesses presented and to listen to their testimony with a perceptive attentiveness. In sum, after weighing and evaluating the Commonwealth's evidence to be found in this record, this court strongly asserts that this case is not one in which a new trial should be awarded based on a weight of the evidence challenge. In truth, right will prevail in this case by an affirmance of these judgments of sentence, and a reversal or reversals would shock the public's and this court's sense of justice and fairness.